UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| BELLAIRE GENERAL HOSPITAL, L.P., § | |
| d/b/a BELLAIRE MEDICAL CENTER, § | CASE NO. 05-30089-H5-11 |
| § | (CHAPTER 11) |
| DEBTOR. § | |

AFFIDAVIT OF GLEN POWERS IN SUPPORT
OF FIRST-DAY APPLICATIONS AND MOTIONS

| | |
|---|---|
| STATE OF TEXAS § | |
| § | |
| COUNTY OF HARRIS § | |

Before me, the undersigned notary public, appeared Glen Powers, who after being duly sworn, testified as follows:

1. I am currently employed as Chief Financial Officer of Bellaire General Hospital, L.P., d/b/a Bellaire Medical Center (the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case. Prior to becoming the Debtor's Chief Financial Officer, I held the position of Controller, and was employed in that capacity commencing September 11, 2000. In these capacities, I am familiar with the daily operations, financial conditions and the books and records of the Debtor.

2. I hereby submit this affidavit (the "Affidavit") in support of the Debtor's first-day applications and motions in the above-captioned chapter 11 case and to assist the Court and other parties-in-interest in understanding the circumstances leading up to the commencement of this chapter 11 case. Any capitalized term not expressly defined herein shall have the meaning ascribed to such term in the applicable first-day application or motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based on my experience, knowledge and information concerning the

Debtor's operations, financial condition and the industry as a whole. If called to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this Affidavit.

3.      Part I of this Affidavit sets forth the organizational structure of the Debtor and recent events that have impacted its business and operations. Part II of this Affidavit describes the circumstances leading up to the filing of the Debtor's chapter 11 petition. Part III of this Affidavit describes the Debtor's debt structure generally, and outlines certain other contracts to which the Debtor is a party. Finally, Part IV of this Affidavit sets forth the relevant facts in support of the Debtor's various early-case applications and motions filed concurrently herewith.

## I.
## BACKGROUND

4.      On January 3, 2005 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code" or "Code"). By separate notice, the Debtor has designated this case as a "Complex Chapter 11" case, in accordance with the local rules adopted by the United States Bankruptcy Court for the Southern District of Texas.

5.      The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      No trustee or examiner has been appointed in the Debtor's bankruptcy case, and no official committee of unsecured creditors has been established.

7.      Bellaire General Hospital, L.P., d/b/a Bellaire Medical Center, is a Texas limited partnership formed on September 1, 2000, among AMT Houston Healthcare, Inc. ("AMT"), a Texas corporation, as it general partner with certain other individuals and entities as the Debtor's limited partners. The Debtor's principal place of business is Houston, Texas.

8. Until shortly before filing this case, the Debtor operated a hospital facility (the "Facility") purchased on or about July 3, 2001 from Columbia Hospital Corporation of Houston ("Columbia HCA") pursuant to a Special Warranty Deed With Vendor's Lien of even date. The effective date of the purchase was July 7, 2001. The Facility's business operations consisted of general hospital and surgical care services, with patient care occurring on both an inpatient and outpatient basis. The Facility has a bed capacity of 317 licensed beds and provided, among other things, ambulatory, cardiology, endoscopy, pediatric, radiology, surgical, psychiatric and emergency care services.

9. The Debtor employed approximately 400 employees. Most of the Debtor's employees were laid off in the last two weeks. Approximately 40 employees remain. They are employed mainly to maintain and secure the Facility pending a sale and to assist in accounting, collection of accounts receivable and administration of the bankruptcy case.

## II.
## EVENTS LEADING UP TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE

10. The purchase of the Facility by the Debtor from Columbia HCA took place at approximately the same time Houston experienced Tropical Storm Allison, which caused massive flooding throughout Houston and other parts of Harris County, Texas. During the tropical storm, the majority of the first floor of the Debtor's building was flooded and required a total renovation. The construction needed for such renovation took much longer, and was much more expensive, than expected by the Debtor. Further, after the purchase, many key positions in the hospital and within its management were filled with individuals whose job performance was poor. Although the Debtor has turned over personnel and believes it now has a clean, renovated and well-staffed medical facility, the lingering effects of the initial problems experienced upon the purchase severely impacted the Debtor's profitability.

11.     The Debtor is also currently burdened with an obligation resulting from overpayments to the Debtor made by Medicare which were recently discovered. As of November 30, 2004, the Debtor's total liability to Medicare was approximately $1,435,000 for 2003 and $2,210,000 for 2004. The Debtor has negotiated an arrangement with Medicare on repayment of approximately $2,055,000 pursuant to which it is refunding the overpayments over a period of time, but such monthly payments constitute a significant drag on the Debtor's cash flow. Additionally, the Debtor has a large debt burden from accounts payable to old vendors, and has been the target of a number of lawsuits involving various vendors, many of which have been settled and require periodic payments. In short, it is these existing obligations, rather than current operating expenses, that are driving the Debtor into a cash-negative position. The Debtor's gross revenues for the 12-month period ending November 30, 2004 were approximately $87,272,000 with total revenue deductions for Medicare, Medicaid, managed care and other deductions of approximately $49,129,000 for net revenue of approximately $38,143,000. The Debtor's operating expenses for this period were approximately $40,063,000, resulting in EBITDA of ($1,919,867).

12.     Although the Debtor has ceased accepting patients and has, or is in the process of, transferring or releasing any remaining patients, the Debtor believes that the facility still has value to a purchaser. The Debtor has been negotiating for several weeks with an interested buyer and anticipates filing a motion to sell the facility in the immediate future.

### III.
### DEBT STRUCTURE AND OTHER OBLIGATIONS

13.     The Debtor's creditors and liabilities are summarized as follows:

(a)     <u>Healthcare Business Credit Corporation ("HBCC")</u>. On July 6, 2001, the Debtor entered into a Loan & Security Agreement with HBCC as lender. As of December 22, 2004, the Debtor owes HBCC approximately $2,205,279. This amount fluctuates, as HBCC provides funds

per the formulary calculation under the Loan & Security Agreement. The indebtedness is secured by the Debtor's accounts receivable, general intangibles, certain blocked accounts and lock boxes, cash, books and records.[1]

(b)  Columbia HCA. Approximately $9,100,000 of the purchase price remains from the purchase of the Facility from Columbia HCA. Columbia HCA is secured by a deed of trust, pursuant to which Columbia HCA asserts a security interest in all of the Debtor's real property and improvements.

(c)  GE Credit Corporation ("GECC"). As of November 30, 2004, GECC is owed approximately $1,700,000 pursuant to Lease Agreements executed in 2001, covering certain equipment at the Facility listed on the Lease/Security Agreement schedules. This obligation is secured by the equipment covered under the agreement, the fair market value of which may significantly exceed the amount owed to GECC.[2]

(d)  Medicare. As described above, Medicare is owed approximately $3,645,000 based on overpayments made to the Debtor. Until the filing of this case, the Debtor was making payments to Medicare of $70,961,09 due on the first of every month, and $34,646.37 due on the 12th day of every month on part of the amount due. This obligation is not literally secured by any of the Debtor's property, however, Medicare may be entitled to rights of offset or recoupment with respect to the Debtor's accounts receivable.

(e)  Hewlett-Packard ("HP"). Pursuant to a Settlement Agreement dated August 16, 2004 with HP, the Debtor is obligated to pay $39,000 on a bi-weekly basis. This

---

1  Since August 2004, HBCC has made a number of additional loans to the Debtor to cover the Debtor's payroll obligations.

2  The Debtor has not yet evaluated its leases to determine whether any of them are security agreements rather than true leases.

obligation is secured by servers and other computer equipment necessary to the Facility's operations.[3] The Debtor last made a payment to HP on December 3, 2004.

(f) <u>Trade Debt</u>. In addition to the foregoing, as of the Petition Date, the Debtor owes approximately $6.6 million to vendors and other third parties on recorded invoices and estimates an additional $1.5 million of accrued but unrecorded invoices. The Debtor further owes approximately $650,000 to insurance companies and other patients not reflected in its accounts payable. These obligations are unsecured.

14. The Debtor is also party to a number of significant contracts and leases, as follows:

(a) <u>Management Agreement</u>. As briefly described above, the Facility is being managed by AMT Group pursuant to the June 29, 2001 Management Agreement. As of November 30, 2004, AMT Group is owed approximately $4,410,138 for management and other fees by the Debtor pursuant to this agreement.

(b) <u>Radiology Agreement</u>. On April 5, 2002, the Debtor entered into an Agreement for Radiology Department Coverage with Innovative Radiology, P.A. As of December 22, 2004, approximately $27,314 is owed to Innovative Radiology, P.A. under the agreement, representing portions of several months of service for which payment has not been made. Additionally, $5,000 will accrue under this agreement for the month of December.

(c) <u>Anesthesiology Agreement</u>. On June 12, 2003, the Debtor entered into a Contract for Professional Anesthesia Services with Bayou Anesthesia & Pain, P.A. As of November 30, 2004, approximately $166,495 is owed to Bayou Anesthesia & Pain, P.A. under the agreement, representing service for the months of September - November inclusive, for which

---

3   See fn. 2.

payment has not been made. Additionally, $53,000 will accrue under this agreement for the month of December.

    (d)  <u>Emergency Room Agreement</u>. On September 11, 2003, the Debtor entered into an Emergency Medical and Administrative Services Agreement with STAT Care of Texas, P.A. As of November 30, 2004, approximately $50,400 is owed to STAT Care of Texas, P.A. under the agreement, representing service for the months of September - November inclusive, for which payment has not been made. Additionally, $20,000 will accrue under this agreement for the month of December.

## IV.
## DEBTOR'S MOTION FOR EMERGENCY HEARING ON FIRST-DAY MOTIONS

  15.  Concurrently with the filing of this Affidavit, the Debtor moves the Court for an emergency hearing on the first-day pleadings. An emergency hearing on such pleadings is necessary to prevent irreparable harm to the Debtor's business and to enable the Debtor to protect and preserve the facility, which serves as collateral for some of the Debtor's lenders.

**A.**  **Emergency Motion of Debtor for Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection to Healthcare Business Credit Corporation.**

  16.  The Debtor seeks interim authority to use cash collateral for a two to three week period to maintain and secure the Facility, pending filing of a motion to sell the Facility. The Debtor intends to use that period to negotiate a longer term cash collateral stipulation with HBCC on acceptable terms. The Debtor is currently seeking to negotiate an agreed final cash collateral order with HBCC. However, due to various factors necessitating the Debtor's chapter 11 filing sooner rather than later, no final agreement with HBCC has yet been reached.

  17.  As previously indicated, HBCC has provided funds to the Debtor from time to time pursuant to a Loan and Security Agreement executed in July 2001. This agreement is secured by,

among other things, all of the Debtor's cash and accounts receivable. Such assets are property of the estate and constitute cash collateral. The Debtor requests authority to use its cash in accordance with the budget attached to its Emergency Motion of Debtor for Interim Order Authorizing Limited Use of Cash Collateral and Providing Adequate Protection to Healthcare Business Credit Corporation (the "Cash Collateral Motion") as Exhibit "A." The authority to use such cash collateral to pay the budgeted expenses should continue until a final hearing.

18. Without authority to use cash collateral, the Debtor will be unable to pay its normal the expenses necessary to maintain and secure the facility, which would jeopardize the potential value to the estate which could be realized from a sale of the Facility intact to a third party purchaser. An interim order on an emergency basis authorizing the Debtor to use cash collateral will allow the Debtor to avoid irreparable harm to the Debtor and will give the Debtor the brief opportunity it needs finalize a sale agreement and seek approval of a sale form this Court. To provide HBCC with adequate protection, the Debtor proposes to grant HBCC a replacement lien on postpetition receivables to secure any use of cash collateral in which HBCC holds a valid and perfected security interest.

**B. Motion for Authority to Pay Employees' Salaries, Wages, Medical Benefits, and Other Related Expenses and Benefits Arising Prior to Entry of Order for Relief.**

19. On the Petition Date, the Debtor's workforce consisted of approximately 293 employees, including (a) one senior management employee, (b) approximately 20 salaried employees and (c) approximately 272 hourly employees.[4] Most of the Debtor's employees were laid off in the

---

4    The Debtor also employs contract employees and independent contractors. The Debtors request that any relief granted by the Court pursuant to the Motion for Authority to Pay Employees' Salaries, Wages, Medical Benefits, and Other Related Expenses and Benefits Arising Prior to Entry of Order for Relief (the "Wage Motion") be extended to such contract employees and independent contractors.

last two weeks. Approximately 40 employees remain. As of the Petition Date, the Debtor estimates that it owes approximately $323,000.00 in prepetition wages and salaries to the categories of employees described above.

20. The relief sought by the Wage Motion is for authority to (a) pay, in the ordinary course of business, the Debtor's remaining employees accrued but unpaid prepetition wages and salaries owed to such employees in accordance with the Debtor's prepetition schedule for such payments, and (b) continue, on a postpetition basis, the payment of wages and salaries to employees in the ordinary course of business.

21. The Debtor seeks the relief requested in the Wage Motion because it is essential to its ability to maximize the value of the estate. Such relief will preserve morale and maintain the Debtor's work force while minimizing the hardship and disruption to them caused by this chapter 11 proceeding.

22. The Debtor's ability to continue maintain and secure the Facility, collect receivables and sell the Facility will be severely jeopardized if employees are not paid the prepetition wages and benefits they have earned. A workforce is indispensable to the maintenance and security of the Facility, and the Debtor's efforts to sell the Facility. Payment of wages and salaries is necessary to preserve the Debtor's existing employees, without which the sale of the Facility will be impaired. Without the relief sought pursuant to the Wage Motion, the necessary employees may seek employment elsewhere, and the performance of remaining employees will likely suffer because of low morale and lack of confidence in the Debtor. Furthermore, if any employees leave, the Debtor will be required to hire new, untrained employees at significant expense. Moreover, absent the relief

requested by the Wage Motion, the employees and their families may suffer undue hardship from their own inability to meet their financial obligations

C. **Emergency Motion for Order Authorizing Interim Maintenance of Prepetition Bank Accounts and Cash Management System and Continued Use of Existing Business Forms, Books and Records.**

23. The Debtor uses a cash management procedure in the ordinary course of business that is designed to permit the efficient collection, application and disbursement of funds. The Debtor, through its Emergency Motion for Order Authorizing Maintenance of Prepetition Bank Accounts and Cash Management System and Continued Use of Existing Business Forms, Books and Records (the "Bank Account Motion"), seeks permission to continue its existing cash management practices for fifteen (15) days following the Petition Date, until it can properly open new debtor-in-possession bank accounts. The Debtor also seeks relief from any requirement that it open new sets of books and records.

24. The Debtor believes that such relief is necessary because compliance with the United States Trustee's guidelines would disrupt the operation of the Facility and severely prejudice the Debtor's ability to reorganize. It would be extremely cumbersome and expensive for the Debtor to implement the guidelines, and the inevitable resulting delay would irreparably damage patient and employee confidence. Moreover, no injury to any party in interest from the relief requested in the Bank Account Motion because the Debtor currently adheres to prudent operating practices and procedures and will continue to do so.

25. Going forward, the Debtor seeks to continue using its existing bank accounts and cash management procedures, subject to the terms of any order entered pursuant to the Cash Collateral Motion. The Debtor submits that the continuation of the cash management system is essential to the

Facility's operation during the pendency of this chapter 11 case. The Debtor seeks to continue the use of its respective bank accounts for fifteen (15) days after the Petition Date to pay postpetition obligations incurred in the ordinary course of business, and will keep strict records of the disposition of all postpetition funds in such accounts.

26. The Debtor's existing cash management accounts function smoothly and permit the efficient collection of cash for the benefit of the Debtor and all parties in interest. Any requirement that the Debtor open new accounts on an immediate basis could potentially result in confusion and delays and hinder the efficient use of the Debtor's resources.

27. The Debtor has a sophisticated, automated record-keeping system, with built in accounting controls, which generates a large portion of its books and records. The Debtor's accounting system will be able to track and separate prepetition versus postpetition periods and transactions.

28. The Debtor, in the ordinary course of business operations, also uses preprinted business forms, many of which are used for numerous daily transactions. By virtue of the nature and scope of the Debtor's business, and the numerous contractors, vendors, suppliers and other parties with whom the Debtor routinely deals, the Debtor in the Bank Account Motion requests that it be permitted to continue to use its business forms without alteration or change. In view of the time delay and confusion that would be involved in creating and printing new purchase orders, invoices and other forms, it is imperative that the Debtor be permitted to use its existing systems, accounts and business forms in order to avoid disruption of the normal operation of the Facility.

**D.     Emergency Motion for Order Authorizing Limited Notice by the Debtor to Creditors and Other Parties in Interest.**

29.     The Debtor has over five hundred unsecured creditors located throughout the United States, primarily vendors supplying the Debtor with the necessary items to run the Facility. In most instances, the claims held by these creditors are for relatively small amounts. Requiring the Debtor to give notice to each and every creditor listed on the creditor matrix for each pleading or notice filed in this case would usurp the Debtor's limited resources. Accordingly, the Debtor requests that the Court enter an Order limiting the parties to which the Debtor is required to give notice in this case.

30.     The Debtor believes that it is appropriate for the Court to enter an Order limiting the parties to which the Debtor is required to give notice, through counsel if appropriate and in the circumstances described in the above motion, to the following: (1) the United States Trustee; (2) any official committee of unsecured creditors appointed in this case; (3) the Debtor's twenty largest unsecured creditors; (4) all secured creditors; and (5) any party requesting notice.

**E.     Emergency Motion for Order Granting Extension of Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs.**

31.     The Debtor's business operations are complex, and its staff has spent a significant amount of time and effort to work toward creative solutions for the financial difficulties recently faced by the Debtor. Because of (i) the complexity of its financial affairs, (ii) the limited staffing available to perform the required internal review of its accounts and affairs, (iii) the Debtor's recent lay offs and (iv) the press of business incident to the commencement of this case, the Debtor has been unable, prior to the commencement of this case, all of the information necessary to complete and file its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs ("SOFAs") with its petition as required by Fed. R. Bankr. P. 1007(c).

32. Given the urgency with which the Debtor sought chapter 11 relief and very limited staff resources remaining to the Debtor, the Debtor has filed concurrently with this Affidavit its Emergency Motion for Order Granting Extension of Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Motion for Extension"). The Motion for Extension requests an extension of thirty (30) days subsequent to the Petition Date for the Debtor to timely submit its Schedules and SOFAs. Nevertheless, recognizing the importance of assembling this information, the Debtor intends to complete the Schedules and SOFAs as quickly as possible under the circumstances. The Debtor believes that the relief sought by the Motion for Extension not only is appropriate under the circumstances, but necessary for the efficient and orderly administration of this case.

FURTHER AFFIANT SAYETH NOT.

DATED: January 10, 2005.

_____
Glen Powers

SUBSCRIBED TO AND SWORN BEFORE ME, the undersigned Notary Public, on the 10th day of January, 2005.

ANDREA L. SISKIND
MY COMMISSION EXPIRES
APRIL 26, 2005

_____
Notary Public in and for the State of Texas

My Commission Expires April 26, 2005

F:\WP\Client-Matters\Bellaire Medical Center, L.P\Pleadings\First Day Motions 12-23-04\Affidavit of Glen Powers in Support of First-Day Applications and Motions.1.10.05.wpd